**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK HABIB, derivatively on behalf of CARLOTZ, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DAVID R. MITCHELL, LUIS IGNACIO SOLORZANO AIZPURU, KIMBERLY H. SHEEHY, LINDA B. ABRAHAM, MICHAEL W. BOR, STEVEN G. CARREL, SARAH M. KAUSS, JAMES E. SKINNER, and THOMAS W. STOLTZ,<br><br>Defendants,<br><br>and<br><br>CARLOTZ, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Mark Habib ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant CarLotz, Inc. ("CarLotz" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Michael W. Bor ("Bor"), Thomas W. Stoltz ("Stoltz"), Linda B. Abraham ("Abraham"), Steven G. Carrel ("Carrel"), Sarah M. Kauss ("Kauss"), David R. Mitchell ("Mitchell"), Kimberly H. Sheehy ("Sheehy"), James E. Skinner ("Skinner"), and Luis Ignacio Solorzano Aizpuru ("Solorzano") (collectively, the "Individual Defendants" and with CarLotz, "Defendants") for breaches of their fiduciary duties as directors

and/or officers of CarLotz, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CarLotz, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action to remedy misconduct committed by CarLotz's directors and officers from December 30, 2020 to May 25, 2021, both dates inclusive (the "Relevant Period").

2. CarLotz operates a consignment-to-retail used-vehicle marketplace where corporate vehicle sourcing partners and retail used-vehicle sellers can sell vehicles lower prices than traditional dealerships.

3. On January 21, 2021, the Company became a publicly-traded corporation through the merger (the "Merger") of one of its predecessors—also called CarLotz, Inc.—with the other predecessor, a publicly-traded blank check company formed for the purpose of effecting a merger—Acamar Partners Acquisition Corp. ("Acamar Partners," also referred to

pre-Merger as the "Company").

4. During the Relevant Period, the Company publicly boasted about two of its business metrics: gross profit and gross profit per unit ("GPU"). The Company also highlighted that these metrics were displaying a trend for growth.

5. Moreover, during the Relevant Period, while touting these purportedly positive developments, the Company also addressed the potential risk of slowing sales in its SEC filings. However, the Company did not disclose that far from being a mere potential risk, as it was being framed in the Company's SEC disclosures, a slowdown in sales was already occurring. As a result of this slowdown in sales, the Company's gross profit and GPU would decline and the Company's potential for growth was overstated.

6. The truth emerged slowly. On March 15, 2021, the Company announced its fourth quarter and full fiscal year 2020 financial results. In a conference call that day, Defendant Stoltz stated that gross profit and GPU "were softer than . . . expected" because of "the surge in inventory during the quarter and the resulting lower retail unit profitability." Defendant Bor also stated on that call that the surge in inventory "created a logjam that resulted in slower processing and higher days to sell."

7. On this news, the Company's common stock fell approximately 8.5% to close March 16, 2021 at $8.45 per share. Over the next two trading days, the Company's common stock fell another 7.3% to close at $7.83 per share on March 18, 2021.

8. Subsequently, on May 10, 2021, the Company announced its first quarter 2021 financial results which again showed that GPU underperforming expectations. The Company had an expected retail GPU range of $1,300 and $1,500, but reported only $1,182.

9. Following this disclosure, the Company's common stock fell about 14% to close

May 11, 2021 at $5.57 per share. The decline continued the next day by about another 8%, with the Company's common stock closing May 12, 2021 valued at $4.12 per share.

10. On May 26, 2021, the truth fully emerged when the Company issued a press release disclosing that "the Company's profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company." The press release further disclosed that "this sourcing partner accounted for more than 60% of the cars sold and sourced" during first fiscal quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" in second fiscal quarter 2021 up to the time of the press release.

11. Following this revelation, the Company's common stock fell approximately 13.4%, to close May 26, 2021 at $4.51 per share.

12. During the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make materially false and misleading statements regarding the Company. The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) due to a surge in inventory the Company was experiencing slower processing and higher days to sell; (2) this would negatively affect GPU; (3) the Company engaged in aggressive pricing to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory; (4) the Company's projected GPU forecast was overstated; (5) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (6) the Company failed to maintain adequate internal controls. As a result, the statements at issue were materially false and misleading and/or lacked a reasonable basis at all relevant times.

13. The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

14. In yet further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ('CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and further subjected the Company to the need for internal investigations, the need to implement adequate internal controls, and losses due to the unjust enrichment of Individual Defendants who were breaching their fiduciary duties—the Company will need to expend large sums of money.

16. Therefore, CarLotz has been substantially damaged by the Individual Defendants' breaches of fiduciary duty and other misconduct.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this action and of the CEO's and CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent, a majority of CarLotz's Board of Directors (the "Board") cannot independently and disinterestedly consider a demand to commence litigation against themselves, the other Individual Defendants, and any other wrongdoers on CarLotz's behalf.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1); Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b); and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question concerning the claims in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims per 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22. Plaintiff is a current shareholder of CarLotz. Plaintiff has continuously held CarLotz common stock at all relevant times.

### Defendants

23. Nominal defendant CarLotz is a Delaware corporation with its principal executive offices at 611 Bainbridge Street, Suite 100, Richmond, Virginia 23224. CarLotz's shares trade on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "LOTZ."

24. Defendant Bor is the CEO and Chairman of the Board of the Company.

25. Defendant Stoltz is the CFO of the Company.

26. Defendant Abraham is a Company director and is the Chair of the Compensation Committee.

27. Defendant Carrel is a Company director. Defendant Carrel is also a Managing Director of TRP Capital Partners, LP ("TRP"), a transportation private equity investment fund. According to the proxy statement that the Company filed with the SEC on Schedule 14A on April 30, 2021 (the "2021 Proxy Statement"), as of April 14, 2021, TRP beneficially owned 19.1% of the Company's common stock of the Company. Defendant Carrel thus also beneficially owns 19.1% the Company's common stock, as of April 14, 2021.

28. Defendant Kauss is a Company director and is a member of the Audit Committee and Compensation Committee.

29. Defendant Mitchell is a Company director. Defendant Mitchell is also a Managing Director of TRP. As such Defendant Mitchell also beneficially owned 19.1% of the Company's common stock as of that date.

30. Defendant Sheehy is a Company director and is the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

31. Defendant Skinner is a Company director and is a member of the Audit Committee and the Chairman of the Nominating and Corporate Governance Committee.

32. Defendant Solorzano is a Company director. Defendant Solorzano is also a member of the Compensation Committee and Nominating and Corporate Governance Committee. Moreover, Defendant Solorzano was a Partner and the CEO of Acamar Partners prior to the Merger. According to the 2021 Proxy Statement, Defendant Solorzano beneficially owned 7.9% of the Company's common stock as of April 14, 2021, as he is deemed a beneficial

owner of the shares held by a related entity, Acamar Partners Sponsor I LLC ("Acamar Sponsor") that beneficially owned 6.8% of the Company's common stock.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

33. CarLotz operates a consignment-to-retail used-vehicle marketplace where corporate vehicle sourcing partners and retail used-vehicle sellers sell vehicles at lower prices than traditional dealerships.

### False and Misleading Statements Made During the Relevant Period

***December 30, 2020 Prospectus***

34. On December 30, 2020, the Company filed a prospectus with the SEC on Form 424B3 (the "Prospectus"). The Prospectus stated the following concerning CarLotz Inc.'s growing inventory:

> In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. COVID-19 impacted both sales and inventory count from March through September 2020. Unit volumes hit a trough in April 2020, with 40% year-over-year declines. We implemented proactive cost-structure optimization measures that helped ensure we maintained sufficient liquidity and we implemented a number of measures to protect the health and safety of our customers and our workforce. Our May 2020 sales grew over 40% month-over-month as travel restrictions began to ease. As wholesale prices skyrocketed, we used our asset-light, non-competitive vehicle sourcing model to defend and grow our margins. With our maintained focus, we delivered our most profitable months since our inception and we believe we are poised to return to industry-leading growth. ***Our retail vehicle units sold were 583 in October and 624 in November, with our starting inventory increasing to 2,172 vehicles as of November 1, 2020 and 2,273 as of December 1, 2020 as compared to 1,567 vehicles available for sale as of September 30, 2020, as we accelerated intake from a rapidly growing national OEM account.***

(Emphasis added.)

35. The Prospectus described any risks from the inventory accumulation as potential, rather than acknowledging that the delays framed as hypothetical were in fact occurring. The

Prospectus stated: "If we are unable to operate our processing centers efficiently, we ***could*** experience delivery delays, a decrease in the quality of our reconditioning services, ***delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners*** and retail sellers and subsequent revenues, which ***may*** materially and adversely affect our business, financial condition and results of operations." (Emphasis added.)

36. The Prospectus also stated the following about the Company's corporate vehicle sourcing partners: "For the nine months ended September 30, 2020, three of our corporate vehicle sourcing partners, with whom we do not have long term consignment contracts, accounted for 49% of the cars we sold." The Prospectus then said: "For the six months in the period ended November 30, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for more than 50% of the cars we sold and more than 50% of our revenues during this period was derived from the sale of these cars."

37. The Prospectus noted that GPU had increased "to $1,900 per unit for the nine months ended September 30, 2020 . . . driven by a shift in the sale of owned units to consigned units." The Prospectus further noted that GPU could "fluctuate from period to period" due to the Company's "alternative fee arrangements with certain of our corporate vehicle sourcing partners." Specifically, the Prospectus said:

> In addition to our flat fee pricing model, we enter into alternative fee arrangements with certain of our corporate vehicle sourcing partners, which can include arrangements where we share a percentage of vehicle sale proceeds and/or customer fees with our corporate sourcing partners. Under these sharing arrangements, our gross profit for a particular unit could be higher or lower than the gross profit per unit we would realize under our flat fee pricing model depending on the unit's sale price and fees we are able to charge in connection with the sale. As we do not have binding long term contracts with our corporate vehicle sourcing partners and do not require them to make vehicles available to us, our mix of vehicles sourced under alternative fee arrangements is likely to fluctuate over time. Our gross profit per unit is therefore likely to fluctuate from period to period, perhaps significantly, due to our sourcing partner mix as well as due to the sales prices and

fees we are able to collect on the vehicles we source under alternative fee arrangements.

38. The statements in paragraphs ¶¶ 34–37 above were materially false and/or misleading and failed to disclose that: (1) due to a surge in inventory the Company was experiencing slower processing and higher days to sell; (2) this would negatively affect GPU; (3) the Company engaged in aggressive pricing to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory; (4) the Company's projected GPU forecast was overstated; (5) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (6) the Company failed to maintain adequate internal controls. As a result, the Company's statements were materially misleading and/or lacked a reasonable basis.

**The Truth Begins Emerging as the False and Misleading Statements Continue**

***March 15, 2021 Conference Call***

39. On March 15, 2021, the Company revealed that its profits were negatively impacted by the increased fourth quarter 2020 inventory. On a conference call to discuss the fourth quarter's and full fiscal year's financial results, Defendant Stoltz stated that profits were negatively affected by "the surge in inventory during the quarter and the ***resulting lower retail unit profitability, as a result of slower sell-throughs and more vehicles wholesaled***." (Emphasis added.) Defendant Bor similarly noted that ***"[t]he additional inventory*** that we secured to drive our growth put pressure on our processing centers and ***created a logjam that resulted in slower processing and higher days to sell***[.]"(Emphasis added.) Defendant Stoltz further remarked that due to these delays caused by the inventory buildup, gross profit and GPU "increased 25%, but were softer than we expected."

40. On this news, the Company's common stock fell 8.5% to close March 16, 2021

at $8.45 per share. Over the next two trading days the slide continued by about 7.3% more, leaving CarLotz's common stock to close at $7.83 per share on March 18, 2021.

41. However, this partial revelation of the truth did not stop the Individual Defendants from maintaining the deception. Defendant Bor stated on that same March 15, 2021 call that CarLotz was "remediating [these issues] through increased staffing, enhanced leadership, and process improvements." Defendant Stoltz sought to emphasize that the issues were close to being dealt with, stating: "As we work through this excess inventory, a large majority of what we're selling right now is this profit share program and as we get our inventory levels more in line with where they should be based on the demand in our existing hubs, we will see the GPU improve substantially on that front." Defendant Stoltz noted that CarLotz "expect[s] our flow of inventory to better match demand now through the balance of this year." He continued: "In the meantime, we expect the higher than ideal inventory levels that we saw earlier this year in our existing hubs to impact our first quarter 2021 gross profit and second quarter to a lesser extent, which impacts our full-year gross profit and GPU guidance."

***March 15, 2021 Form 10-K***

42. That same day, the Company filed its annual report for the fiscal year ended December 31, 2020 with the SEC on Form 10-K (the "2020 10-K"). The 2020 10-K stated the following of the Company's relationships with its corporate vehicle sourcing partners, in relevant part:

> ***One or more of our corporate vehicle sourcing partners may represent 10% or more of our total vehicles consigned, and at times significantly more, in the normal course of our vehicle sourcing***.
>
> One or more of our corporate vehicle sourcing partners will often represent 10% or more of the vehicles we source over a particular period. For example, during the year ended December 31, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for over 40% of the cars we sold. Furthermore, for the fourth quarter of 2020 and

> continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced. Over time, we may have concentrations of 10% or more for a number of reasons, and the concentrations will often vary among corporate vehicle sourcing partners. Some corporate vehicle sourcing partners may make a supply of vehicles available at certain times of a given year, while others may increase or decrease their flow of vehicles for a number of reasons, including the performance of their business or prevailing business considerations and economic conditions.
>
> Furthermore, at times, we may source a significantly higher portion of our consigned vehicles from one or more corporate vehicle sourcing partners. Such concentrations can result from a variety of factors, some of which are beyond our control. During any given time period, we may elect to source a higher percentage of vehicles from one or more corporate vehicle sourcing partners for a variety of reasons, including the availability of specific vehicle makes and models.
>
> Sourcing a significant portion of our consigned vehicles from a limited number of corporate vehicle sourcing partners exposes us to a number of risks. Our agreements with our corporate vehicle sourcing partners are generally subject to cancellation by either party upon 30 to 90 days' notice. Generally, corporate vehicle sourcing partners make non-binding long-term commitments to us regarding consignment volumes. If a corporate vehicle sourcing partner from which we are sourcing a significant portion of our vehicles were to cease or significantly reduce making vehicles available to us, it could adversely affect our business, financial condition and results of operations as we would likely need to increase our sourcing of vehicles from other vehicle sourcing partners potentially on less favorable terms and conditions. Such an effort may take a number of months and may not precisely replicate the variety and quality of vehicles we have been sourcing from this single source. Further, we could be required to increase our purchasing of vehicles to maintain optimal inventory levels and mix as we work to increase vehicle supply from other vehicle sourcing partners, which could negatively affect our margins and gross profit per vehicle. Furthermore, having a high concentration of vehicles in our inventory on consignment from a single corporate vehicle sourcing partner could indirectly expose us to credit risk with respect to that corporate vehicle sourcing partner as we may be restricted from selling those vehicles or realizing profits on the sale of those vehicles in the event of that corporate vehicle sourcing partner's insolvency.

43. The 2020 10-K discussed the Company's GPU decline and described a continued GPU decline, lasting beyond the first fiscal quarter 2021, as a possibility, stating:

> For the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners with whom we have an alternative fee arrangement has accounted for over 60% of our vehicles sourced.

> Under our fee arrangement with this corporate vehicle sourcing partner, vehicles are returned to the corporate vehicle sourcing partner from consignment if the vehicle has not been sold through our retail channel within a specified time period.
>
> In such instances, we are responsible for the expenses we have incurred with respect to the vehicle, including shipping costs and any refurbishment costs we have incurred. We have returned a number of vehicles from consignment during the first quarter of 2021 to date and expect to continue to return vehicles into the second quarter of 2021 as we seek to better match our intake of vehicles under this arrangement to our sales and reconditioning capacity. ***The expenses associated with these returned vehicles will reduce our gross profit during the first quarter of 2021 and for subsequent periods during which we experience such vehicle returns***.

(Emphasis added.)

44. The statements in paragraphs ¶¶ 41–43 above were materially false and/or misleading and failed that: (1) the Company engaged in aggressive pricing to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory; (2) the Company's projected GPU forecast was overstated; (3) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (4) the Company failed to maintain adequate internal controls. As a result, the Company's statements were materially misleading and/or lacked a reasonable basis.

***April 30, 2021 Proxy Statement***

45. On April 30, 2021 the Company filed the 2021 Proxy Statement with the SEC. Defendants Bor, Abraham, Carrel, Kauss, Mitchell, Sheehy, Skinner, and Solorzano solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related

46. The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Mitchell, Sheehy, and Solorzano to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent auditor for 2021.

47. The 2021 Proxy Statement stated the following of the Board's risk oversight function:

> Our Board has extensive involvement in the oversight of risk management related to us and our business and accomplishes this oversight through the regular reporting to our Board by the Audit Committee. The Audit Committee represents our Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls and our compliance with legal and regulatory requirements. Through its regular meetings with management, the Audit Committee reviews and discusses all significant areas of our business and summarizes for our Board all areas of risk and the appropriate mitigating factors. In addition, our Board receives periodic detailed operating performance reviews from management.

48. The 2021 Proxy Statement was materially false and misleading because it failed to disclose that, despite the 2021 Proxy Statement's description of the Board's risk oversight function, the Board was not actually performing this function, was causing or permitting the Company to issue false and misleading statements to the investing public, and therefore that the Individual Defendants on the Board were breaching their fiduciary duties.

49. The 2021 Proxy Statement also failed to disclose that: (1) the Company engaged in aggressive pricing to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory; (2) the Company's projected GPU forecast was overstated; (3) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (4) the Company failed to maintain adequate internal controls.

---

claims.

50. As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders, reelected Defendants Mitchell, Sheehy, and Solorzano to the Board, allowing them to continue breaching their fiduciary duties to the Company.

***May 10, 2021 Press Release and Earning Call***

51. On May 10, 2021, the Company issued a press release containing its first quarter 2021 financial results that displayed the following chart showing that GPU fallen below expectations:

| | Guidance | Results | |
|---|---|---|---|
| New Hub Openings | Three | Three | Met Expectations |
| Retail Units Sold | 1,900 to 2,100 | 2,554 | Exceeded Expectations |
| Net Revenue | $42 to $46 million | $56.6 million | Exceeded Expectations |
| Gross Profit | $1.6 to $2.0 million | $2.0 million | Met Expectations |
| Retail Gross Profit per Unit ("Retail GPU") | $1,300 to $1,500 | $1,182 | Below Expectations |
| SG&A Expenses | $17 to $19 million | $18.9 million, excluding non-cash stock compensation expense of $42 million | Met Expectations |
| Net Loss | $(16) to $(15) million | $(15) million | Met Expectations |

52. Also on May 10, 2021, on a conference call to discuss the Company's financial results for the first quarter 2021, Defendant Stoltz further admitted that "gross profit and retail GPU both decreased year-over-year as a result of the carryover of Q4 excess inventory as related to our profit share account." Still, Defendant Stoltz asserted that the Company had "cleared substantially all of this aged inventory in the quarter ahead of schedule with aggressive pricing rather than absorbing shipping and reconditioning costs on vehicles returns to the client. While this negatively impacted our retail GPU in the quarter, we did achieve the high end of our gross profit guidance by selling more of these units late in the quarter." While claiming that GPU would "improve," Defendant Bor troublingly revealed that the Company would "not to give

specific guidance[.]"

53. On this news, the Company's common stock fell about 14% to close May 11, 2021 at $5.57 per share. The next day, May 12, 2021, the Company's common stock experienced a further decline of about 8%, to close at $4.12.

54. The above statements identified in ¶¶ 51 and 52 were materially false and/or misleading and failed to disclose that: (1) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (2) the Company failed to maintain adequate internal controls. As a result, the Company's statements were materially misleading and/or lacked a reasonable basis.

## The Truth Fully Emerges

55. On May 26, 2021, the Company issued a press release titled: "CarLotz Provides Update on Profit-Sharing Sourcing Partner Arrangement, Timing of New Hub Openings and Updated 2021 Outlook[.]" In the press release, the Company revealed that its "profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company." This was a major development given that this corporate vehicle sourcing partner "accounted for more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 at the time of the press release. Due to this development, the CarLotz lowered its financial outlook as follows:

> **Updated 2021 Outlook**
>
> The Company is updating its 2021 outlook and financial guidance and comments with respect to its expected second quarter 2021 performance previously provided on May 10, 2021 as a result of:
>
> - the current business climate, as impacted by the lack of vehicles from this profit-sharing account, coupled with the unpredictable timeline of the chip shortage for new cars and its impact on the wholesale and retail automotive markets; and

- the slippage in certain hub openings to later than previously expected.

For the full year 2021, the Company expects the following results. This 2021 outlook assumes that, in the second quarter of 2021, the Company will sell greater than 2,000 retail units and will achieve a gross profit per unit of at least $1,800.

| | |
|---|---|
| New Hub Openings | 14 to 16 hub openings, most of which are expected to open in the back half of the year |
| Retail Units Sold | 13,000 to 15,000, which represents more than a 100% increase over 2020 retail units sold |
| Net Revenue | $272 to $317 million, which represents more than a 125% increase over 2020 net revenue |
| Gross Profit | $20 to $26 million, which represents more than a 75% increase over 2020 gross profit |
| Retail GPU | $1,650 to $1,850 |
| SG&A Expenses | $98 to $102 million, excluding non-cash stock compensation expense expected to be approximately $52 million |
| Adjusted EBITDA* | $(82) to $(72) million |
| Weighted Average Common Stock Shares Outstanding | 111 million shares |
| Capital Expenditures | $45 to $50 million |

146. Following this revelation, the Company's common stock fell approximately 13.4%, to close May 26, 2021 at $4.51 per share.

## DAMAGES TO CARLOTZ

147. The Individual Defendants' misconduct has directly and proximately caused CarLotz to lose and expend many millions of dollars.

148. These expenditures include, without limitation, the costs and fees associated with the Securities Class Action filed against CarLotz, its CEO, and its CFO, any internal investigations conducted by the Company, and amounts paid to outside lawyers, accountants, investigators, or other consultants in connection thereto.

149. These expenditures also include, without limitation, unjust compensation, benefits, and other payments paid to the Individual Defendants who were breaching their fiduciary duties.

150. The Individual Defendants' misconduct has directly and proximately caused CarLotz to suffer a loss of reputation and goodwill. A "liar's discount" will affect the Company's stock moving forward due to the Company's and the Individual Defendants' misrepresentations and the Individual Defendants' breaches of fiduciary duties.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

151. Plaintiff brings this action derivatively for the benefit of CarLotz to remedy injuries suffered as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CarLotz, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

152. CarLotz is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

153. Plaintiff is, and has been at all relevant times, a shareholder of CarLotz. Plaintiff will adequately and fairly represent the interests of CarLotz in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

154. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

155. A pre-suit demand on the Board of CarLotz is excused as futile. At the time this suit was filed, the Board was comprised of eight members: Defendants Bor, Abraham, Carrel, Kauss, Mitchell, Sheehy, Skinner, and Solorzano (the "Director Defendants"). Plaintiff needs to allege demand futility as to four of eight Director Defendants.

156. Demand is excused as to all of the Director Defendants because each of them faces a substantial likelihood of liability due to the scheme in which they knowingly or

recklessly participated to make and/or cause the Company to make false and misleading statements and omissions of material facts. Their participation in this scheme renders them unable to impartially investigate the charges and decide whether to pursue this action against themselves.

157. The Director Defendants knowingly or recklessly participated in this scheme in violation of their fiduciary duties. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. In further breach of their fiduciary duties, the Director Defendants caused the Company to fail to maintain internal controls. As a result of this conduct, Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is excused as futile.

158. Demand is futile on Defendant Bor for the following, additional reasons. Defendant Bor is the Company's CEO and the Chairman of the Board. As the Company admits, he is a non-independent director. The Company provides Defendant Bor with his principal occupation and substantial compensation. As the Company's highest officer, Defendant Bor was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period. Defendant Bor personally made false and misleading statements on earnings conference calls and signed the 2020 10-K which also contained false and misleading statements. In addition, the 2021 Proxy Statement was solicited on his behalf and contained false and misleading statements. As the Company's highest officer and as Chairman, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. In addition, Defendant Bor is a defendant in the Securities Class Action. Therefore, Defendant Bor breached his fiduciary duties, faces a

substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

159. Demand is futile on Defendant Abraham for the following, additional reasons. Defendant Abraham signed the 2020 10-K which contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on her behalf and contained false and misleading statements. As a trusted Company director, she conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Abraham breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon her is futile and, thus, excused.

160. Demand is futile on Defendant Carrel for the following, additional reasons. Defendant Carrel signed the 2020 10-K which contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Carrel breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

161. Demand is futile on Defendant Kauss for the following, additional reasons. Defendant Kauss signed the 2020 10-K which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on her behalf and contained false and

misleading statements. As a trusted Company director, she conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Kauss breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon her is futile and, thus, excused.

162. Demand is futile on Defendant Mitchell for the following, additional reasons. Defendant Mitchell signed the 2020 10-K which contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements that contributed to his reelection to the Board. As a trusted Company director, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Mitchell breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

163. Demand is futile on Defendant Sheehy for the following, additional reasons. Defendant Sheehy signed the 2020 10-K which contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on her behalf and contained false and misleading statements that contributed to her reelection to the Board. As a trusted Company director, she conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Sheehy breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and

demand upon her is futile and, thus, excused.

164. Demand is futile on Defendant Skinner for the following, additional reasons. Defendant Skinner signed the 2020 10-K which contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Skinner breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

165. Demand is futile on Defendant Solorzano for the following, additional reasons. Defendant Solorzano signed the 2020 10-K which contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements that contributed to his reelection to the Board. As a trusted Company director, he conducted little oversight of the scheme to cause the Company to make false and misleading statements and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme. Therefore, Defendant Solorzano breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand upon him is futile and, thus, excused.

166. Demand is futile on the Board for the following, additional reasons.

146. Defendant Mitchell and Carrel are managing directors of TRP which has engaged in substantial business with CarLotz. Therefore, Defendants Michell and Carrel are party to numerous related party transaction. Prior to the Merger, CarLotz, Inc. owed TRP monthly

management fees of $21,000, $373,000 of which had been paid or accrued for the year ended December 31, 2020. CarLotz, Inc. had a payable to TRP, totaling $5.1 million as of December 31, 2020, included in accrued expenses on its consolidated balance sheet incorporated in CarLotz, Inc.'s consolidated financial statement prior to the Merger.

147. In addition, Endurance Dealer Services LLC, owned by TRP, underwrites and administers contracts sold by CarLotz and is ultimately reinsured by Orange Peel Protection Reinsurance, Ltd., a subsidiary of CarLotz. In 2019, CarLotz Inc. entered into a Master Services Agreement with Flex Fleet Rental LLC, as one of its corporate vehicle sourcing partners. TRP is a Flex Fleet Rental LLC investor. This substantial business history, and the prospect of further business, prevents Defendants Michell and Carrel from disinterestedly and independently considering litigation against themselves and the other Individual Defendants, which might threaten the relationship between TRP and CarLotz.

148. Moreover, on January 21, 2021, the Company entered into a registration rights and lock-up agreement (the "Registration Rights and Lock-Up Agreement") with Acamar Sponsor, controlled by Defendant Solorzano, and certain pre-Merger CarLotz, Inc. stockholders (collectively with Acamar Sponsor, the "Holders"). The Registration Rights and Lock-Up Agreement required the Company to file and have declared and maintained effective a registration statement to register the resale of certain shares of common stock held by the Holders. Such a registration statement was declared effective on March 23, 2021.

149. In addition, the Registration Rights and Lock-Up Agreement gives Defendant Bor; TRP, controlled by Defendants Mitchell and Carrel; and Acamar Sponsor, controlled by Defendant Solorzano; (Defendant Bor, TRP, and Acamar Sponsor, collectively the "Demanding Holders") two demand rights each, permitting them to demand that the Company file a

registration statement to register the Company securities held by the Demanding Holder. Moreover, each Demanding Holder may specify that such demand registration take the form of an underwritten offering. The Demanding Holders have unlimited rights to request that the Company register an underwritten offering per these resale registration statements.

150. The Registration Rights and Lock-Up Agreement also requires CarLotz to pay certain expenses relating to these registrations and to indemnify the Holders against certain liabilities that may arise under the Securities Act of 1933.

151. These rights under the Registration Rights and Lock-Up Agreement, and their value to Defendants Bor, Carrel, Mitchell, and Solorzano, create conflicts of interest and render Defendants Bor, Carrel, Mitchell, and Solorzano incapable of considering a demand against themselves and the other Individual Defendants with the requisite independence and disinterestedness.

152. Further, Acamar Partners, controlled by Defendant Solorzano, entered into subscription agreements (the "Subscription Agreements") in connection with the Merger with a number of purchasers (the "Subscribers"). Per the Subscription Agreements, the Subscribers agreed to purchase, and Acamar Partners agreed to sell, shares of common stock (the "PIPE Shares") for $10.00 per share and an aggregate of $125 million (the "PIPE Investment"). CarLotz is required to file and maintain an effective registration statement with respect to the PIPE Shares for the benefit of the Subscribers.

153. As part of the PIPE Investment, TRP, controlled by Mitchell and Carrel, purchased 1,000,000 PIPE Shares for $10,000,000; Defendant Bor purchased 166,000 PIPE Shares for $1,660,000; and Acamar Sponsor, controlled by Defendant Solorzano, purchased 250,214 PIPE Shares for $2,502,140.

154. These Subscription Agreements pose additional conflicts of interest for Defendants Bor, Carrel, Mitchell, and Solorzano rendering them even more unable to independently and disinterestedly consider a demand against themselves and the other Individual Defendants.

155. Defendants Kauss, Sheehy, and Skinner (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. The Company's Audit Committee Charter charges the Audit Committee Defendants with oversight of the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. The Audit Committee Defendants failed to adequately exercise their oversight functions as required by the Audit Committee Charter, failed to ensure the integrity of the Company's internal controls, and allowed materially misleading financial statements to be disseminated in the Company's SEC filings and other public disclosures. Therefore, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

156. CarLotz has been exposed to significant losses due to the wrongdoing complained of herein Still, the Director Defendants have not filed any lawsuits against the Individual Defendants, including themselves, or any others who were responsible for this wrongdoing, making no attempt to recover for CarLotz any part of the damages it has suffered due to this wrongdoing. Therefore, any demand now upon the Director Defendants would be futile.

157. The Individual Defendants' actions were not the product of legitimate business judgment as they were based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty. As all of the Director Defendants face a substantial likelihood of liability, they are self-interested in the

transactions challenged herein are incapable of independently and disinterestedly considering whether to pursue this action on behalf of the Company. Therefore, demand is further excused as futile.

158. The acts complained of herein constitute violations of fiduciary duties owed by CarLotz's officers and directors. These acts are incapable of ratification.

159. The Director Defendants may also be protected against personal liability for their breaches of fiduciary duty by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds. If there is a directors' and officers' liability insurance policy, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known, *inter alia*, as the "insured-versus-insured exclusion." Thus, if the Director Defendants sued themselves, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. If, however, the suit is brought derivatively, as this action is brought, such insurance coverage, if it exists, will provide a basis for the Company to recover. Therefore, demand on the Director Defendants is excused as futile.

160. If there is no directors' and officers' insurance, then the Director Defendants will not cause CarLotz to sue the Individual Defendants since, if they did, they would face large uninsured individual liabilities. Thus, demand is futile in either event..

161. For the foregoing reasons, all of the Director Defendants, and if not all of them then at least four, cannot consider a demand with disinterestedness and independence. Therefore, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

162. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides: "It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

164. Rule 14a-9 promulgated under § 14(a) of the Exchange Act provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

165. Under the direction and watch of the Director Defendants the 2021 Proxy Statement failed to disclose that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function, the Board was not in fact performing this function and was causing or permitting the Company to issue false and misleading statements.

166. Moreover, the 2021 Proxy Statement failed to disclose that: (1) the Company engaged in aggressive pricing to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory; (2) the Company's projected GPU

forecast was overstated; (3) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (4) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

167. The Director Defendants, had they been exercising reasonable care, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including the election of Defendants Mitchell, Sheehy, and Solorzano.

168. The false and misleading elements of the 2021 Proxy Statement led to, among other things, the election of the Defendants Mitchell, Sheehy, and Solorzano. This allowed Defendants Mitchell, Sheehy, and Solorzano to continue breaching their fiduciary duties to CarLotz.

169. The Company was damaged because of the Director Defendants' material misrepresentations and omissions in the 2021 Proxy Statement.

170. Plaintiff on behalf of CarLotz has no adequate remedy at law.

## **SECOND CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172. Each Individual Defendant owed to CarLotz the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

173. Each of the Individual Defendants breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

174. The Individual Defendants' conduct was due to their intentional or reckless breach of the fiduciary duties they owed to CarLotz. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CarLotz.

175. In breach of their fiduciary duties owed to CarLotz, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) due to a surge in inventory the Company was experiencing slower processing and higher days to sell; (2) this would negatively affect GPU; (3) the Company engaged in aggressive pricing to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory; (4) the Company's projected GPU forecast was overstated; (5) the corporate vehicle sourcing partner was likely to pause consignments to the Company due to market conditions and the Company's pricing strategy; and (6) the Company failed to maintain adequate internal controls. As a result, CarLotz's public statements were materially false and misleading at all relevant times.

176. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

177. In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

178. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CarLotz's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

179. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CarLotz has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181. Plaintiff on behalf of CarLotz has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants Bor and Stoltz for Contribution Under Sections 10(b) and 21D of the Exchange Act

182. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183. CarLotz, Defendant Bor, and Defendant Stoltz are named as defendants in the Securities Class Action, which asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations, the Company's liability will be in whole

or in part due to Defendants Bor's and Stoltz's willful and/or reckless violations of their obligations as officers and/or a director of CarLotz.

184. Defendants Bor and Stoltz, because of their positions of control and authority as CEO and CFO of CarLotz, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of CarLotz, including the wrongful acts complained of herein and in the Securities Class Action.

185. Therefore, Defendants Bor and Stoltz are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

186. Thus, CarLotz is entitled to receive all appropriate contribution or indemnification from Defendants Bor and Stoltz.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of CarLotz, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CarLotz;

(c) Determining and awarding to CarLotz the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with prejudgment and post-judgment interest thereon;

(d) Directing CarLotz and the Individual Defendants to take all necessary

actions to reform and improve CarLotz's corporate governance and internal procedures to comply with applicable laws and to protect CarLotz and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of CarLotz to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding CarLotz restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 27, 2021

**THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

# VERIFICATION

I, Mark Habib am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 10/25/2021, 2021.

DocuSigned by:

[signature]

F745A6874B2C47A...

Mark Habib